UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
KAMEL PRUDE,

                    *Plaintiff,*

v.                                                    No. 1:20-cv-0674

LOGISTICS ONE TRANSPORT, INC.,

                    *Defendant.*
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                              OF COUNSEL:

FITZGERALD MORRIS BAKER            JOHN D. ASPLAND, ESQ.
     FIRTH, P.C.                              MICHAEL CROWE, ESQ.
*Attorneys for Plaintiff*
68 Warren Street, Box 2017
Glens Falls, NY 12801


BOND, SCHOENECK & KING, PLLC       ROBERT F. MANFREDO, ESQ.
*Attorneys for Defendant Logistics One*   RIANE F. LAFFERTY, ESQ.
     *Transport, Inc.*
22 Corporate Woods Blvd., Suite 501
Albany, New York 12211


DAVID N. HURD
United States District Judge


**<u>MEMORANDUM-DECISION and ORDER</u>**

## I.  INTRODUCTION

This is an employment discrimination action brought by plaintiff Kamel Prude ("Prude" or "plaintiff") concerning his time working for defendant Logistics One Transport, Inc. ("LOTI", the "Company", or "defendant").

On June 16, 2020, Prude filed a ten-count complaint asserting claims for discrimination, retaliation, and hostile work environment under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. § 1981 ("Section 1981"), and the New York State Human Rights Law ("NYHRL"), N.Y. Exec. L. § 296.  Plaintiff also brought common law claims for intentional infliction of emotional distress ("IIED") and negligence.  LOTI answered on August 17, 2020, raising numerous affirmative defenses.

On April 4, 2022, LOTI moved for summary judgment, seeking dismissal of Prude's complaint in its entirety.  The motion has been fully briefed and the Court will consider it on the basis of the submissions without oral argument.

## II.  BACKGROUND[1]

LOTI is a distribution-systems provider owned by William McNeary ("McNeary").  Dkt. 39-7, Plaintiff's Response to Statement of Material Facts ("RSMF"), ¶¶ 1, 9.  The Company offers trucking transportation services for

---

[1] The following facts are drawn from the parties' statements of undisputed material facts and responses pursuant to Local Rule 7.1(a)(3), to the extent those facts are well-supported by pinpoint citations to the record, as well as the exhibits attached thereto and cited therein.

clients throughout the Northeast.  *Id*. at ¶ 1.  Prude is a former employee of defendant.  *Id*. at ¶ 2.  Plaintiff began working for defendant on or about December 2, 2015, and worked at the Company until September 13, 2018.  *Id*. Though defendant claims plaintiff voluntarily resigned from his employment, plaintiff claims his separation from the Company was a constructive discharge.[2]  *Id*.

   LOTI initially hired Prude to work as a night shift Dispatcher, where he worked 12-hour shifts four days per week from 8pm to 8am.  RSMF at ¶ 3. Plaintiff's job responsibilities included confirming load assignments with the Company's drivers, monitoring drivers' progress on their routes to ensure timely pick-ups and deliveries, and reviewing documentation regarding deliveries.  *Id*.  Plaintiff earned a rate of $16.25 per hour, plus a $1.00 per hour night differential, for a total of $17.25 per hour.  *Id*.

   Thomas Moss ("Moss"), LOTI's Director of Transportation, served as Prude's supervisor while he worked the night shift Dispatcher position, though Moss himself worked the day shift.  RSMF at ¶ 5.  Richard Theophel ("Theophel"), LOTI's Night Operations Supervisor, oversaw the Company's transportations operations during the night shift.  *Id*. at ¶ 6. Accordingly,

---

[2] Notably, however, plaintiff does not bring a claim for constructive discharge.

plaintiff reported directly to Theophel during his night shifts, and Theophel

reported directly to Moss.  *Id.*

Kathleen Occhiogrosso ("Occhiogrosso") was LOTI's Director of Human

Resources while Prude was employed at the Company, though her position

was eliminated in August of 2019 due to financial difficulties within the

organization.  RSMF at ¶ 7.  Together, Occhiogrosso and Moss made the

decision to hire plaintiff.  *Id.* at ¶ 8.

James Clark ("Clark") began working for LOTI in February 2017 as

Carrier Capacity Manager and RFP Pricing Manager.  RSMF at ¶ 11.  In this

capacity, Clark also supervised Prude for a brief period while plaintiff worked

in the day shift Track and Trace position at LOTI.  *Id.*

When LOTI hired Prude, it provided him a copy of the Company's

Employee Handbook.  RSMF at ¶ 15.  The Employee Handbook contains the

Company's Harassment Policy, which states "[LOTI] encourages an efficient,

productive and creative work environment; therefore [LOTI] will not tolerate

harassment in the workplace."  *Id.* at  ¶ 13.  The Harassment Policy further

provides that "[a]nyone who engages in harassing conduct may be subject to

appropriate discipline including discharge."  *Id.*  Additionally, the

Harassment Policy sets forth the following reporting procedure:

> Any employee who believes he or she has been harassed, or any
> employee who is aware of harassing behavior directed toward another
> employee, should immediately report that behavior to his or her

supervisor, manager, or the Human Resources Manager. All complaints of harassment will be investigated. The investigation will be conducted in a confidential manner. Corrective action, consistent with the results of the Company's investigation will be taken. The Company will monitor and will not tolerate any retaliation, intimidation, coercion, threats, or harassment of any kind against any employee who has made a complaint under this policy or has participated in the investigation of any complaint under this policy.  *Id*. at ¶ 14.

Plaintiff signed an acknowledgment that he received the handbook. RSMF at ¶ 14.  Plaintiff understood the Harassment Policy and that the Company had a reporting procedure for employees who believed they had been subject to discrimination, harassment, or retaliation in the workplace. *Id*. at ¶ 16.

Prude worked the night shift, but toward the end of 2017, he expressed interest in moving to a day shift position because he wanted to "make more money and work less hours."  RSMF at ¶ 22.  Plaintiff also informed Moss that he could not work every other weekend.  *Id*.  In November 2017, related to these discussions, Moss spoke with plaintiff about an open day shift position in LOTI's Brokerage Division known as Track and Trace.  *Id*. at ¶ 23. The day shift Track and Trace position carried essentially the same job duties as plaintiff's night shift Dispatcher position.  *Id*.  Plaintiff expressed some concern about losing his $1 night shift differential if he transferred to the day shift position, but he was still interested in doing so for scheduling reasons. *Id*. at ¶ 24.

On November 2, 2017, Prude emailed Clark and then-Brokerage Manager Karlie Hall, now known as Karlie Monahan ("Monahan"), stating that he was interested in transferring to the open day shift Track and Trace position. RSMF at ¶ 25.  Clark knew that plaintiff had previous expressed concern about losing the $1 night shift differential and asked him if he had resolved this issue. *Id*.  Plaintiff responded that he was unsure about the wage issue, but was still hoping to be hired for the day shift position. *Id*.

In December 2017, LOTI eliminated Prude's night shift Dispatcher position because the Company no longer needed it.  RSMF ¶ 26.  Defendant already had night shift Dispatchers working from 6pm to 6am, which made plaintiff's 8pm to 8am shift redundant. *Id*.  Given plaintiff's expressed interest in the day shift Track and Trace position, the Company transferred him there. *Id*.  Additionally, although he was not required to do so, Moss allowed plaintiff to keep his $1 night differential by increasing his base pay to $17.25 per hour. *Id*.  Although plaintiff was still concerned that there would be a difference in hours between the night shift Dispatcher and the day shift Track and Trace positions, he was otherwise enthusiastic about transferring to the day shift position. *Id*. at ¶ 27.

While working the day shift Track and Trace position, Prude worked a rotating schedule that averaged forty-two hours per week.  RSMF at ¶ 28. This rotating schedule accommodated plaintiff's need to have certain

weekends off, as he had requested.  *Id.*  Plaintiff's rotating schedule also accommodated his need to work both at LOTI and at his other job with the New York State Thruway Authority.  *Id.* at ¶ 28.  As noted, Clark was plaintiff's supervisor for a brief period while he worked in this role.  *Id.* at ¶ 28.

In April 2018, while Prude was working the Track and Trace position, he applied internally for a position as a Carrier Acquisition Coordinator ("CAC").  RSMF at ¶ 30.  Though this position gave plaintiff fewer hours to work than he did with Track and Trace, he avers that it was a position of higher authority and higher pay.  *Id.*  Plaintiff applied for the CAC position because he "did not want to work 12-hour shifts anymore" and also wanted to be paid more.  *Id.* at ¶ 31.  Two other white LOTI employees also applied internally for the CAC position.  *Id.* at ¶ 32.

According to LOTI, the CAC position required proficiency in Microsoft Excel, so Clark – who was solely responsible for the hiring decisions associated with this position – tested the applicants on their Excel abilities.  RSMF at ¶ 33.  Plaintiff disputes that the CAC position required proficiency in Excel.  *Id.*  Ultimately, according to defendant, Clark decided not to hire Prude or the other two internal candidates for the CAC position because they lacked the requisite proficiency in Excel.  *Id.* at ¶¶ 32, 33.  Instead, defendant posted the position externally and hired an outside candidate with many

years of Excel experience.  *Id*. at ¶ 33.  As plaintiff notes, the outside

candidate defendant hired was also white.  *Id*. at ¶ 32.  Plaintiff also claims,

through the affidavit of Monahan, who is no longer with the Company, that

McNeary told her he prefers to hire young, white, male employees.  *Id*. at

¶ 34.

Prude and Clark were not without their own problems.  For instance,

Clark told plaintiff that he spoke "too hood-ish," which plaintiff believed was

related to his being from Brooklyn.  RSMF at ¶ 55.  In addition, in May 2018,

Clark called plaintiff a "moron" and "stupid" during an altercation.  *Id*.

According to plaintiff, during the altercation, Clark also mentioned that he

keeps his gun on him.   Dkt. 34-4, Ex. B at 149:6-151:16.  At no point during

the altercation did Clark use racially derogatory language or display racial

animus.  *See id*.  After the altercation, Prude learned from another employee,

Courtney Allard ("Allard") that Clark had referred to him as a "coon," which

he took to mean that he was either "slow" or "because of his eyes."  RSMF

at ¶ 55.  Around this time, Prude also learned from Monahan that Clark said

he would "go back to selling drugs" if he could not work out his scheduling

issues with the Company.  Dkt. 34-4, Ex. B at 153:7-9.

The Company immediately disciplined Clark for this altercation with

plaintiff; the disciplinary report makes no mention of race-based statements

by Clark, but does reference his aggressive behavior.  *Id*. at ¶ 56.  As part of

his discipline, the Company counseled Clark regarding his conduct and required him to attend anger management training.  *Id*.  Moreover, the Company switched plaintiff's supervisor back to Moss, so he was no longer required to report to Clark.  *Id*.

Aside from Clark's comments, Prude describes several instances of racially insensitive or derogatory conduct that occurred at LOTI during his employment.  RSMF at ¶ 46.  For instance, plaintiff notes comments made in fall of 2016 by Frank Russell ("Russel"), a driver for defendant, where he complained about "city guys" coming to the town.  RSMF at ¶ 47.  While Russell testified that he was not referring to black or Hispanic individuals, but rather  "flatlanders," or affluent people from cities, *id*., plaintiff testified that Russell told him he was referring to black and Hispanic people.  Dkt. 34-4, Ex. B at 51:8-11.  Plaintiff testified that he told Theophel and Moss about Russell's comments, that Moss said he would take care of it, and that there were no further incidents involving derogatory comments from Russell going forward.  *Id*. at 52-53, 55-56, 60-61.

In September 2017, another of LOTI's drivers, Mark Murphy ("Murphy") called Prude a "coon" and an "Uncle Tom."  RSMF at ¶ 49.  At the time, plaintiff did not know what the term "coon" meant, and had to call his father to find out.  *Id*.  As with "coon," plaintiff testified that he did not understand what Murphy meant by "Uncle Tom." *Id*.  Theophel overheard Murphy call

plaintiff a "coon" and alerted Moss, who assured plaintiff that such language was not tolerated.  *Id*. at ¶ 50.  In addition, plaintiff spoke directly to Murphy, explaining that he felt disrespected and wanted Murphy to treat him with respect.  *Id*.  Murphy apologized to plaintiff after this exchange, and plaintiff told Theophel the two had "worked things out."  *Id*.  Plaintiff never complained to Human Resources about his issues with Russell or Murphy, or about Theophel or Moss's response.  *Id*. at ¶ 51.

Another LOTI driver, Ward Trackey ("Trackey") told Prude that the Company had previously disciplined him for using the "N" word in response to Trackey's reference of Martin Luther King, Jr. Day as the "[N word's] birthday."  RSMF at ¶ 52.  Aside from recounting his punishment for the racially insensitive comment, Trackey never said anything inappropriate or insensitive to plaintiff.  *Id*.

Prude also describes incidents involving himself and Christopher LaBarge ("LaBarge"), one of LOTI's former drivers.  For instance, in May of 2017, LaBarge called plaintiff a "jigaboo," though plaintiff did not know what the term meant at the time and thought it was derogatory towards homosexuals rather than racially insensitive.  RSMF at ¶ 53.  Plaintiff did not report this incident to defendant.  *Id*.

According to defendant, in early May of 2018, Moss and Occhiogrosso also learned about an incident from several months prior involving Prude and

LaBarge.  RSMF at ¶ 36.[3]  Specifically, in fall of 2017, while in the

Company's break room, LaBarge walked over to plaintiff, held a banana over

his head, and in the process, called plaintiff a "jigaboo" while making

"monkey sounds."  *Id.*  Plaintiff recalls that several of his coworkers

witnessed the incident.  Dkt. 34-4, Ex. B at 102:7-15.

Upon learning of the banana incident, LOTI claims that Moss and

Occhiogrosso investigated it and took disciplinary action against LaBarge.

RSMF at ¶ 37.  Prude disputes this characterization, because although the

record shows that Occhiogrosso and Moss spoke with LaBarge, explained that

his conduct was prohibited and unacceptable, and recommended termination,

defendant ultimately did not fire him.  *Id.* at ¶ 39.  While Moss and

Occhiogrosso may have recommended termination, McNeary believed

LaBarge was merely being ignorant and not intentionally malicious in his

actions.  *Id.*  Accordingly, instead of firing him, defendant issued LaBarge a

final written warning and suspended him for one week without pay.  *Id.*

Following LOTI's investigation and disciplinary action of LaBarge in May

2018, there were no further incidents involving him and Prude.  RSMF ¶ 40.

---

[3] Plaintiff disputes when Human Resources learned of the banana incident. Via an affidavit from Monahan, plaintiff claims that in "late 2017," Theophel, plaintiff's direct supervisor, told her that he had reported the incident to Human Resources. *See* Dkt. 39-6 at  ¶ 4.  Yet plaintiff himself testified at his deposition that he only spoke to a few "drivers" about the incident when it occurred, Dkt. 34-4, Ex. B at 103:25-104:11, and that, otherwise, the first time he spoke to anyone about the incident was when he reported it to Monahan in May of 2018, *id.* at 104:12-19, 110:19-111:15.

However, less than eight months later, defendant fired LaBarge after he made racially insensitive comments towards a different coworker.  Dkt. 34-4, Ex. E at 62:9-64:11.

As noted *supra*, Prude's final day with LOTI was September 13, 2018. RSMF at ¶ 42.  On December 21, 2018, plaintiff filed a complaint with the New York State Division of Human Rights ("SDHR"), which he dual filed with the Equal Employment Opportunity Commission ("EEOC"), alleging race discrimination, retaliation, and hostile work environment.  *Id*. at 43.  By Notice and Final Order dated February 6, 2020, the SDHR – pursuant to plaintiff's request – dismissed his complaint for administrative convenience. *Id*. at 44.  The EEOC issued a Dismissal Notice and Right to Sue on May 5, 2020.  *Id*.  On June 16, 2020, Prude filed the instant complaint.  Dkt. 1.

### III. <u>LEGAL STANDARD</u>

Under Rule 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is material for purposes of this inquiry if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

In assessing whether there are any genuine disputes of material fact, "a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party." *Ward v. Stewart*, 286 F. Supp. 3d 321, 327 (N.D.N.Y. 2017) (citation omitted).  Summary judgment is inappropriate where a "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted).

## IV. DISCUSSION

In its motion for summary judgment, LOTI seeks dismissal of Prude's complaint in its entirety.  The Court will address each of plaintiff's causes of action in turn.

### 1. Hostile Work Environment

In seeking dismissal of Prude's hostile work environment claim, LOTI first argues that certain allegations in the complaint are barred by the applicable statutes of limitation and the Court should disregard them.

 For claims under Title VII, an aggrieved employee must file an administrative complaint with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the alleged discriminatory act. *Allen v. New York City Dep't of Env't Prot.*, 51 F. Supp. 3d 504, 510 (S.D.N.Y. 2014); *see also* 42 U.S.C.A. § 2000e-5(e). As for claims under the NYHRL, the statute of limitations is three years from the date that the claim accrues,

measured from the filing of the action in court.  *Sesay-Harrell v. NYC Dep't of Homeless Servs.*, 2013 WL 6244158, at *12 (S.D.N.Y. Dec. 2, 2013) (citations omitted); *see also* N.Y. C.P.L.R. § 214(2).[4]

"Under the continuing violation exception to the Title VII limitations period, if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 220 (2d Cir. 2004) (citation omitted).[5]  To bring a claim within the continuing violation exception, a plaintiff must at the very least allege that one act of discrimination in furtherance of the ongoing policy occurred within the limitations period.  *Id.* (citation omitted).  "A claim of hostile work environment is timely so long as one act contributing to the claim occurred within the statutory period; if it did, 'the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.'"  *Id.* (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)).

---

[4] While courts in this Circuit generally recognize that the three-year statute of limitations under the NYHRL is tolled during the pendency of an EEOC complaint, the limitations period is not tolled where, as here, the plaintiff requested dismissal for administrative convenience.  *See Henderson v. Town of Van Buren*, 15 A.D.3d 980, 981 (Sup. Ct. App. Div. 4th Dep't 2005) (citing N.Y. Exec. Law § 297(9)).

[5] The continuing violation exception also applies to NYHRL claims.  *Milani v. Int'l Bus. Machines Corp.*, 322 F. Supp. 2d 434, 452 n.32 (S.D.N.Y. 2004), *aff'd* 137 F. App'x 430 (2d Cir. 2005) (citing *Staff v. Pall Corp.*, 233 F. Supp. 2d 516, 527 (S.D.N.Y. 2002), *aff'd*, 76 F. App'x 366 (2d Cir. 2003)).

Prude argues that Clark's actions in May of 2018, which are within the limitations period[6] for both Title VII and the NYHRL, contribute to his hostile work environment claim and thus all acts constituting that claim are timely under the continuing violation exception. Beyond noting Clark's verbal and physical abuse in May of 2018, plaintiff has hardly taken pains to identify evidence for the Court which may support a hostile work environment claim. However, the record indicates at least one incident from May 2018 that could contribute to a hostile work environment. Specifically, plaintiff stated in his deposition that a coworker, Allard, heard Clark refer to him as a "coon" in May 2018. *See* Dkt. 34-4 at 151:17-153:20. According to plaintiff, Allard later shared this information with him and others in a meeting. *Id*. at 153:14-20. Monahan similarly noted Allard's discomfort with Clark's reference to plaintiff as a "coon" and "monkey" during this time period. Dkt. 39-6 at ¶ 8.

While secondhand accounts are generally "less impactful" than direct statements, courts recognize that the former should not be ignored for purposes of evaluating a hostile work environment claim. *Sletten v. LiquidHub*, Inc., 2014 WL 3388866, at *7 (S.D.N.Y. July 11, 2014); *see also Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) ("The mere fact

---

[6] For plaintiff's Title VII claim, the limitations period begins on February 24, 2018 – 300 days prior to his filing with the EEOC. For plaintiff's NYHRL claim, the limitations period begins on June 16, 2017 – 3 years prior to when he filed his complaint in this Court.

that [a plaintiff] was not present when a ... derogatory comment was made will not render that comment irrelevant to his hostile work environment claim").  Accordingly, because there is evidence of at least one act contributing to Prude's hostile work environment claim occurring within the Title VII and NYHRL limitations periods, the Court will not discount plaintiff's allegations or evidence from outside of these limitations periods when considering his claim.[7]

LOTI next argues that Prude's allegations are not sufficiently severe or pervasive to give rise to an actionable hostile work environment based on his race, color, or national origin, and, even if they are, that there is insufficient evidence to impute liability to the Company.

The same standards govern hostile work environment claims under Title VII, Section 1981, and the NYHRL.  *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 n.4 (2d Cir. 2014).  A plaintiff must establish

---

[7] Defendant argues in a footnote that the Court should not apply the continuing violation exception because plaintiff failed to allege a continuing violation in his administrative complaint with the EEOC or the complaint in this action.  It is true that a plaintiff "may not rely on a continuing violation theory" unless he "has asserted that theory in the administrative proceedings." *Fitzgerald v. Henderson*, 251 F.3d 345, 360 (2d Cir. 2001).  However, claims not raised in an EEOC complaint may be brought in federal court if they are "reasonably related" to the claim filed with the agency; the central question is whether the charge gave the agency "adequate notice to investigate discrimination on both bases." *Williams v. New York City Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006).  This exception to the exhaustion requirement is "essentially an allowance of loose pleading" because EEOC charges are frequently filled out without the benefit of counsel.  *Id.* (citation omitted).  It is undisputed that, in plaintiff's complaint filed with the SDHR and EEOC, he alleged race discrimination, retaliation, and hostile work environment.  RSMF at ¶ 43.  This was sufficient to put the agency on notice of potential continuing violations – as reflected in the investigator's report tracing the use of racial slurs in plaintiff's workplace.  *See* Dkt. 34-4 at 747.

two elements in order to prevail on a claim based on a hostile work environment: (1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer. *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002).

To establish the first element of a hostile work environment claim, a plaintiff must produce enough evidence to show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (citation omitted). In considering whether a plaintiff has met this burden, courts should "examin[e] the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance." *Id.* (citation omitted). Moreover, the "test has objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Id.* (citation omitted).

17

It is well-recognized that, "mistreatment at work, whether through subjection to a hostile environment or through [other means], is actionable under Title VII only when it occurs because of an employee's ... protected characteristic," such as race or national origin. *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).

As a general matter, isolated remarks or occasional episodes of harassment do not constitute a hostile environment within the meaning of Title VII. *See Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999). While a plaintiff need not present a list of specific acts, he must "still prove that the incidents were 'sufficiently continuous and concerted' to be considered pervasive" or that "a single episode is 'severe enough' to establish a hostile working environment." *Brennan*, 192 F.3d at 318 (citations omitted); *see also Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 724 (2d Cir. 2010) (stating that plaintiff can establish a hostile work environment through evidence of a single incident of harassment that is "extraordinarily severe"). Where reasonable jurors could disagree as to whether alleged incidents of racial insensitivity or harassment would have adversely altered the working conditions of a reasonable employee, the issue of whether a hostile work environment existed may not properly be decided as a matter of law. *Patterson*, 375 F.3d at 227.

LOTI argues that the racially offensive incidents Prude experienced while employed at the Company are not sufficiently severe or pervasive to create a hostile work environment.  The record generally indicates isolated racial remarks made by coworkers, many of which were either not directed at plaintiff or not understood by plaintiff to be racially motivated.  *See*, *e.g.*, RSMF ¶ 47 (Russel making broad comment, not directed toward plaintiff, that "city guys…move upstate and mess up the town"); *id*. ¶ 52 (Trackey telling plaintiff he was disciplined by the Company the week prior for using the "N" word when referring to Martin Luther King Day); *id*. ¶ 49 (Murphy calling plaintiff a "coon" and an "Uncle Tom," comments plaintiff did not understand to be racially motivated at the time); *id*. ¶ 53 (LaBarge calling plaintiff a "jigaboo," which plaintiff believed at the time to mean "gay").

The record also shows that Clark, Prude's supervisor for a brief period, engaged in certain racially insensitive behavior.  Clark made one, possibly two, racially insensitive comments to coworkers outside of plaintiff's presence: (i) plaintiff learned from a coworker that Clark called him a "coon" during a meeting in May 2018, Dkt-34-4, Ex. B at 151:19-154:99; and (ii) plaintiff learned from another coworker that Clark said he would "go back to selling drugs" if he could not work out his scheduling issues with the

Company, *id.* at 153:4-10. [8]  Plaintiff also highlights the altercation between he and Clark from May 2018, arguing that it "falls squarely into the 'severe and pervasive' factors."  However, plaintiff himself acknowledged that Clark did not use any racially derogatory language or display any racial animus during the altercation.  *See* Dkt. 34-4, Ex. B at 149:6-151:16.

In sum, no reasonable jury could find that these isolated comments made by several different coworkers over Prude's three-year employment period were sufficient to alter plaintiff's working conditions and create an abusive working environment.  *See Schwapp*, 118 F.3d at 110-11 ("For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity … meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments") (internal citations omitted); *Sletten*, 2014 WL 3388866, at *7 ("secondhand comments are not as impactful on one's environment as are direct statements; consequently, they are less persuasive …").

The above incidents may not be severe or pervasive enough to establish the first element of a hostile work environment, but they provide context for another incident that Prude argues is sufficiently severe on its own to create an issue of material fact – when LaBarge held a banana over his head in

---

[8] Clark also told plaintiff that he spoke too "hood-ish," but plaintiff understood that comment to relate to his being from Brooklyn, not to his race or national origin.  Dkt. 34-4, Ex. B at 142:6-143:14.

front of a room full of coworkers and called him a "jigaboo" and "my little monkey" while making monkey sounds.  DSMF at ¶ 37.  Predictably, LOTI responds that this incident was not "extraordinarily severe" enough to create a hostile work environment.

Given that the banana incident involved not only highly offensive racial remarks and gestures, but also a physical prop in the form of a banana, which LaBarge held in close proximity to plaintiff while several people watched, the Court is unable to determine, as a matter of law, that such an incident is insufficiently severe to create a hostile work environment.  This is particularly true in light of the aforementioned isolated incidents of racism that plaintiff experienced while employed at LOTI.  Ultimately, whether the banana incident was sufficiently severe to create an objectively hostile or abusive work environment, and whether plaintiff subjectively perceived that environment to be abusive, are questions for the factfinder.  *See Patterson*, 375 F.3d at 230 (finding question of fact as to whether single incident in which plaintiff was subjected to racial remarks, punched, and sprayed with mace was sufficiently severe to create actionable hostile work environment); *see also Daniel v. T & M Prot. Res., LLC*, 689 F. App'x 1, 2 (2d Cir. 2017) (summary order) (noting that *Schwapp v. Town of Avon* did not "foreclose the possibility that the one-time use of a severe racial slur could, by itself support a hostile work environment claim when evaluated in the cumulative reality of

the work environment"); *Rogers v. City of New Britain*, 189 F. Supp. 3d 345, 356 (D. Conn. 2016) (finding genuine issue of material fact regarding whether single use of the word "nigga" and display of gorilla wearing plaintiff's work shirt created hostile work environment and noting that "the gorilla incident alone may be enough to deny the defendants' motion for summary judgment").

LOTI also argues that Prude cannot impute the conduct that created the hostile environment to the Company. The standard for imposing liability on an employer for workplace harassment by employees depends on the status of the harasser:

> If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. In cases in which the harasser is a "supervisor," however, different rules apply. If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided. Under this framework, therefore, it matters whether a harasser is a "supervisor" or simply a co-worker.

*Hamilton v. Cnty. of Onondaga, New York*, 2018 WL 4554496, at *13 (N.D.N.Y. Sept. 21, 2018) (citing *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013)). An employee is a supervisor for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim. *Id.* A tangible employment action

constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.  *Id.*

To establish an employer's negligence in controlling workplace conditions, a plaintiff must demonstrate that his employer: (i) "failed to provide a reasonable avenue for complaint"; or (ii) "knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action."  *Hamilton*, 2018 WL 4554496, at *14 (citing *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009)).  The latter avenue of vicarious liability (knowledge and failure to act) "requires a plaintiff to show that (1) *someone* had actual or constructive knowledge of the harassment, (2) the knowledge of this individual can be imputed to the employer, and (3) the employer's response, in light of that knowledge, was unreasonable."  *Id.* (citing *Duch*, 588 F.3d at 763) (emphasis in original).  "If the evidence creates an issue of fact as to whether an employer's action is effectively remedial and prompt, summary judgement is inappropriate."  *Gallagher v. Delaney*, 139 F.3d 338, 348 (2d Cir. 1998), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998).

Since LaBarge was plaintiff's co-worker, not a supervisor, LOTI can only be liable if it was negligent in controlling its working conditions. *See Hamilton*, 2018 WL 4554496, at *13. To that end, defendant argues there is insufficient evidence to hold it liable because it took prompt remedial actions against LaBarge once learning about the incident, and that following its disciplinary action, there were no further incidents involving plaintiff and LaBarge.[9]

Prude responds that there is a fact issue as to whether defendant's actions were effectively remedial and prompt. In support, plaintiff first claims through his and Monahan's affidavits that his direct supervisor at the time, Theophel, was aware of the banana incident the night that it occurred in fall of 2017, but LOTI did nothing about it until over six months later. Dkt. 39-5 at ¶ 28; Dkt. 39-6 at ¶ 4. Defendant argues that the Court should not credit plaintiff and Monahan's statements because they contradict plaintiff's prior deposition testimony.

Unfortunately for LOTI, it does not matter if the Court credits Prude and Monahan's statements about Theophel, because even if defendant acted

---

[9] A plaintiff can also establish an employer's negligence in controlling workplace conditions by demonstrating that it failed to provide a reasonable avenue for complaint. *Hamilton*, 2018 WL 4554496, at *14. Defendant has presented its Harassment Policy, which contains a complaint reporting procedure, and it is undisputed that plaintiff received, acknowledged, and understood this policy. RSMF at ¶¶ 14-16. In opposition, plaintiff does not argue that defendant failed to provide a reasonable avenue for complaint, and instead has elected to merely engage with defendant's arguments about remedial actions.

promptly, there is a question of fact as to the appropriateness of its resulting

discipline following the banana incident.  The record shows that Occhiogrosso

and Moss spoke with LaBarge and explained that his conduct was prohibited

and unacceptable.  Dkt. 39-9 at ¶ 39.  Initially, Moss and Occhiogrosso

recommended that LOTI terminate LaBarge from his employment.  *Id*.

However, McNeary, the owner of the Company, believed LaBarge was merely

being ignorant and not intentionally malicious.  *Id*.  Thus, instead of

termination, defendant issued LaBarge a final written warning and

suspended him for a week without pay.  *Id*.  Ultimately, less than eight

months later, defendant fired LaBarge after he made racially insensitive

comments towards a different coworker.  Dkt. 34-4, Ex. E at 62:9-64:11.

Viewing all inferences from these facts in the light most favorable to

Prude, a reasonable jury could conclude that LOTI failed to effectively

respond to the banana incident and remediate the hostile work environment.

Although defendant suspended LaBarge for a week without pay and issued

him a final written warning, a reasonable juror could view this punishment

as a "slap on the wrist," particularly because it ultimately failed to deter

LaBarge from future racially insensitive behavior.  *See Gallagher*, 139 F.3d

at 348; *MacMillan v. Millennium Broadway Hotel*, 2011 WL 4357523, at *5

(S.D.N.Y. Sept. 16, 2011) ("Because there are often material issues of fact

about the promptness and adequacy of an employer's remedial efforts, summary judgment is frequently not appropriate").

Accordingly, there are issues of fact as to whether the banana incident was sufficiently severe on its own to support a hostile work environment claim, as well as whether LOTI effectively responded to it.  Defendant's motion for summary judgment seeking dismissal of Prude's hostile work environment claims must be denied.

## 2. Discrimination

LOTI next argues that Prude cannot establish a *prima facie* claim of discrimination based on race, color, or national origin, and, even if he could, he cannot establish pretext.[10]

Claims of employment discrimination are governed by the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[11]  Under this standard, to make a *prima facie* case of employment discrimination a plaintiff must show that: (1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered

---

[10] Although plaintiff alleges that he was discriminated against because of his national origin, his complaint contains no factual allegations that would require the Court to analyze it separate and apart from his claim of race discrimination.

[11] Courts employ the same standards for employment discrimination claims under Title VII, Section 1981, and the NYHRL.  *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 n.9 (2d Cir. 2008) (NYHRL); *Lumhoo v. Home Depot USA, Inc.*, 229 F. Supp. 2d 121, 136 (E.D.N.Y. 2002) (Section 1981) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993) and *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000)).

an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to inference of discriminatory intent. *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 75 (2d Cir. 2016). The burden of production then shifts to the defendant to demonstrate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* (citation omitted).

If the defendant makes such a showing, "the burden returns to the plaintiff to show that the real reason for [the adverse employment action] was his race and national origin." *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 491–92 (2d Cir. 2010).[12] "The plaintiff must come forward" with "not simply 'some evidence,' but 'sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action.'" *Balk v. New York Inst. of Tech.*, 683 F. App'x 89, 93 (2d Cir. 2017) (summary order) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)). "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination. To get to the jury, it is not enough ... to disbelieve the employer; the

---

[12] For this final step, a plaintiff asserting a Section 1981 claim has the added burden of establishing that the plaintiff's race or national origin was the "but-for" cause of the adverse employment action. *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014-15 (2020).

factfinder must also believe the plaintiff's explanation of intentional discrimination." *Weinstock*, 224 F.3d at 42 (cleaned up).

LOTI first argues that it did not subject plaintiff to any adverse employment actions or treat him differently because of his race or national origin, and thus, he cannot establish a *prima facie* case of discrimination. Rather than apply the *McDonnell Douglas* test formalistically, however, the Court will assume that plaintiff has made out a *prima facie* case of discrimination on this claim and proceed directly to the final two steps in the *McDonnell Douglas* inquiry. *See Lapsley v. Columbia Univ.*, 999 F. Supp. 506, 515 (S.D.N.Y. 1998) (listing cases in which the court assumed, without detailed analysis, that the plaintiff established a prima facie case of discrimination).

First, the Court considers whether LOTI has provided a legitimate, nondiscriminatory explanation for the employment actions it took with respect to Prude. In its motion, defendant discusses two potential adverse employment actions: (i) plaintiff's transfer to the day shift Track and Trace position and the resulting rotating schedule; and (ii) defendant's decision to hire an external candidate, rather than him, for the CAC position. Plaintiff, for his part, does not identify any other potential adverse employment actions in his opposition brief (and, as noted *infra*, only engages with defendant's arguments as to the CAC position).

28

With respect to plaintiff's transfer to the day shift Track and Trace position, it is undisputed that defendant placed plaintiff in this role solely because it no longer needed (and therefore eliminated) the night shift Dispatcher position. RSMF at ¶¶ 26, 62.   It is also undisputed that plaintiff had previously expressed interest in both the day shift and that very position. *Id.* Moreover, although not required to do so, defendant allowed plaintiff to keep the $1-higher night shift pay differential and plaintiff kept virtually all of the same job duties as his prior position on the night shift. *Id.* at ¶ 63. This day shift schedule also accommodated plaintiff's scheduling needs, allowing him to work for a second job. *Id.* at ¶ 29.   This evidence is sufficient under *McDonnell Douglas* to establish a legitimate, nondiscriminatory reason for defendant's conduct.

LOTI has also proffered legitimate, nondiscriminatory reasons for denying Prude's application to the CAC position – namely, that he was not proficient in Microsoft Excel.   It is undisputed that, as part of the hiring process for the CAC position, defendant also considered (and passed over) two other internal applicants (who were also white males).   RSMF at ¶ 33.   Given that none of the three internal candidates possessed the requisite Excel proficiency, defendant then posted the position externally.   *See id.* Plaintiff does not dispute that the outside candidate defendant ultimately hired had many years of experience working with Excel.   *See id.*

Taken as true, LOTI's evidence permits the conclusion that it had nondiscriminatory reasons for transferring Prude to the day shift Track and Trace position and denying his application to the CAC position – defendant has successfully discharged its burden of production under the second prong of *McDonnell Douglas.  See Holcomb*, 521 F.3d at 141.

Now, the Court must consider whether Prude has raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that LOTI's employment decisions were based, at least in part, on his race.

As an initial matter, the Court notes that it is unclear from his barebones opposition brief whether Prude is even arguing that defendant's proffered reasons for their employment decisions were pretextual, or whether he is simply claiming that there is a fact issue on the fourth element (discriminatory intent) of a *prima facie* employment discrimination claim. Moreover, Prude does not even address the day shift Track and Trace position, and focuses solely on defendant's decision not to hire him for the CAC position.  In any event, even construing plaintiff's arguments and proffered evidence in a light most favorable to him and assuming that he is attempting to demonstrate pretext, the Court finds that he comes up short.

To support a rational finding that LOTI's proffered reasons for declining to hire Prude for the CAC position were false, plaintiff presents but two bits of

evidence.  First, plaintiff cites Monahan's statement that Microsoft Excel was not a necessary skill for the CAC position.  *See* RSMF at ¶ 33.  Plaintiff explains that Monahan, who previously oversaw the CAC position, felt that no Microsoft Excel experience was necessary to perform the job.  Dkt. 39-6 at ¶ 28.  But although Monahan may not have found it necessary to use Excel at the time she supervised the CAC position, Clark (who plaintiff does not dispute was in charge of hiring for the position during the relevant period), testified that that the CAC job required compiling, mining, and organizing carrier data, and when he took over as supervisor for the CAC position, he was explicitly looking for a candidate who could use Excel.  Dkt. 39-2 at 37:1-15.  As noted *supra*, neither plaintiff nor the other two white internal candidates did well on Clark's Excel assessment, so he sought out and hired an outside candidate who was more proficient in Excel.  *Id*. at 38:6-15.

Even assuming that Monahan's statement alone is enough to disbelieve Clark's explanation for using the Excel test as hiring criteria, it ultimately does nothing to show, as it must, that the test is pretext for actual discrimination.  Indeed, the record is clear that Clark also used the test to evaluate two other internal candidates, both of whom were white. As with plaintiff, defendant passed over the two white internal candidates because they did poorly on the Excel test.  Plaintiff has simply not provided any

evidence that would allow a factfinder to believe that Clark administered the Excel test to intentionally discriminate against him.

Second, Prude again cites Monahan, who claims that McNeary's criteria for hiring CAC employees was "white, male, and fresh out of college." Dkt. 39-6 at ¶ 12. But even if McNeary was LOTI's owner, plaintiff does not dispute that Clark alone was the person in charge of hiring for the CAC position, RSMF at ¶ 34, and offers nothing tying McNeary's purported criteria to Clark or the decision to hire an outside candidate for the CAC position. Indeed, Clark himself testified that McNeary gave him no guidance on which candidates or types of candidates to choose. *See* Dkt. 39-2 at 58-18-23.

In sum, Prude fails to meet the burden imposed by *McDonnell Douglas*. Even drawing all reasonable inferences in the light most favorable to plaintiff, the evidence he presents is not sufficient to permit a rational factfinder to infer that LOTI's employment decisions were based in whole or in part on discrimination. No reasonable jury could infer from plaintiff's proffered evidence (or lack thereof) that defendants made their decisions based on a discriminatory motive.

Accordingly, defendant is entitled to summary judgment on plaintiff's employment discrimination claims.

### 3. Retaliation

As it does for his discrimination claim, LOTI argues that Prude cannot establish a *prima facie* case for retaliation and, even if he could, he cannot establish pretext.

Like discrimination claims, retaliation claims are evaluated under the *McDonnell Douglas* three-step burden-shifting analysis. *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010). To make out a *prima facie* case of retaliation, a plaintiff must demonstrate that: (1) he engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered an adverse employment action; and (4) there was a causal connection between the protected activity and that adverse action. *Id.* (citation omitted).[13]

The plaintiff's burden to make out a *prima facie* case is *de minimis,* and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Hicks*, 593 F.3d at 164 (citation omitted). If the plaintiff sustains this initial burden, "a presumption of retaliation arises" and the defendant must then "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* (citations

---

[13] Courts employ the same standards for retaliation claims under Title VII, Section 1981, and the NYHRL. *See Gutierrez v. City of New York*, 756 F. Supp. 2d 491, 509 n.12 (S.D.N.Y. 2010) (citing *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 312-13 (2004)) (NYHRL); *Taitt v. Chemical Bank*, 849 F.2d 775, 777 (2d Cir. 1988) (Section 1981).

omitted).  If so, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Id.* (citation omitted).  A plaintiff can sustain this burden by proving that "a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause[;] if the employer was motivated by retaliatory animus, Title VII is violated even if there were objectively valid grounds for the [adverse employment action]." *Id.* at 164-65 (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990).

LOTI argues that Prude cannot establish the first, third, and fourth elements of a retaliation claim, and thus cannot make out a *prima facie* claim.  Additionally, as it did for plaintiff's discrimination claim, defendant argues that it had legitimate, non-discriminatory reasons for any employment actions taken with respect to plaintiff, and plaintiff is unable to demonstrate pretext.

Notwithstanding the fact that Prude hardly offers any evidence to make out his *prima facie* case, his claims nonetheless fail as a matter of law because, as noted *supra*, LOTI has demonstrated legitimate, non-discriminatory reasons for its employment actions taken with respect to plaintiff, and he has failed to raise a genuine issue of fact in rebuttal.

Accordingly, as with the discrimination claims, LOTI is entitled to summary judgment on Prude's retaliation claims.

**4.  Intentional Infliction of Emotional Distress and Negligence**

In his tenth cause of action, Prude brings what appears to be a claim for intentional infliction of emotional distress ("IIED") and in his eleventh cause of action he brings what appears to be a negligence claim.  LOTI argues that both claims are subject to dismissal as a matter of law, and plaintiff does not even address defendant's arguments in his opposition.

Though it will not undergo a rigorous analysis for claims that Prude effectively concedes are subject to dismissal, the Court finds that LOTI's arguments are persuasive.

As to Prude's IIED claim, the Court agrees with LOTI that, among other things, it was untimely.  New York's statute of limitations for IIED is one year.  *See* N.Y.C.P.L.R. § 215(3); *see also Ornstein v. Pakistan Int'l Airlines Corp.*, 888 F. Supp. 28, 31, n.11 (S.D.N.Y. 1995).  Since plaintiff filed this lawsuit nearly two years after his resignation from LOTI, any IIED claim would be time-barred, and dismissal is appropriate.

Prude's negligence claim fares no better, and must be dismissed because it is barred by the exclusivity provision of the New York Workers' Compensation Law.  *See* N.Y. Workers' Comp. Law § 29(6); *Pasqualini v. Mortgage IT, Inc.*, 498 F. Supp. 2d 659, 666 (S.D.N.Y. 2007) (holding that common law negligence claim premised on hostile work environment was subject to dismissal under New York Workers' Compensation Law); *Maas v.*

*Cornell Univ.*, 683 N.Y.S.2d 634, 636 (Sup. Ct. App. Div. 3d Dep't 1999), *aff'd*,

94 N.Y.2d 87 (1999) (holding New York Workers' Compensation Law bars

claims against an employer for injuries caused by "negligence in failing to

institute and follow policies to prevent discriminatory conduct").

Accordingly, LOTI is entitled to summary judgment on Prude's IIED and

negligence claims.

## V. **CONCLUSION**[14]

Therefore, it is

ORDERED that

1.  Defendant's motion for summary judgment GRANTED in part and

    DENIED in part;

    a.  Plaintiff's claims for discrimination (Counts II, IV, and VII),

        retaliation (Counts V, VI, and VIII), intentional infliction of

        emotional distress (Count X), and negligence (Count XI) are

        DISMISSED;

    b.  Plaintiff's claims for hostile work environment (Counts I, III, and

        IX) remain for trial;

2.  Trial on plaintiff's remaining claims is set for January 9, 2023.

---

[14] Plaintiff has failed to label his eleven causes of action, complicating the Court's determination of which specific causes of action remain for trial.  This decretal paragraph reflects the Court's best attempt to divine which causes of action match each of plaintiff's claims.

IT IS SO ORDERED.

David N. Hurd
U.S. District Judge

Dated:  September 9, 2022
    Utica, New York.